UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cr-20160-EA

UNITED STATES OF AMERICA,

v.

DANIEL HALLORAN,

Defendant.

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS**

**THIS CAUSE** is before the Court on Defendant Daniel Halloran's ("Defendant") Motion

to Suppress Statement and Physical Evidence (the "Motion"). [ECF No. 63]. The Motion was

referred to the undersigned by United States District Judge Ed Artau. [ECF No. 66]. For the reasons

below, it is **RECOMMENDED** that Defendant's Motion be **DENIED**.

**BACKGROUND**

On April 10, 2025, Defendant Halloran was charged by indictment with one count of

transportation of visual depictions involving the sexual exploitation of minors, in violation of 18

U.S.C. §§ 2252(a)(1), (b)(1) and one count of possession of visual depictions involving the sexual

exploitation of minors, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2). *See* [ECF No. 67 at 5].

The charges stem from a Customs and Border Patrol ("CBP") secondary inspection on March 29,

2025, at Miami International Airport ("MIA"). *See* [ECF No. 62 at 1]; [ECF No. 67 at 2]. At issue

here is whether Defendant voluntarily provided the passcode to his cellphone to Custom and

Border Control ("CBP") Officer Alexis Reyes ("Officer Reyes") during a secondary inspection

interview at Miami International Airport ("MIA"). *See generally* [ECF No. 63]. Defendant argues

1

he was coerced during his interview and involuntarily provided the passcodes to his electronic devices. He argues his passcodes and the materials found on his devices as a result should be suppressed. *See* [*id.*]. Additionally, he argues that, although he was at the border returning to the United States on an international flight, the search of his phone without a warrant or reasonable articulable suspicion was contrary to the Fourth Amendment to the Constitution. *See* [*id.*].

## Evidentiary Hearing Testimony

The Court conducted an evidentiary hearing on Defendant's Motion to Suppress. *See* [ECF No. 76]. Officers Reyes and Burgos testified for the government and the government introduced three exhibits into evidence: a CBP "Tear Sheet" entitled "Border Search of Electronic Devices" (the "Tear Sheet"), a written *Miranda*[1] waiver signed by Defendant, and the audio recording of Defendant's interview with Homeland Security Investigations ("HSI") Agent Kenny Silva ("Agent Silva"). *See* [ECF Nos. 77, 79].

Officer Reyes' Testimony

Officer Reyes testified that he had been employed as a CBP officer since 2018 and is assigned to the human trafficking unit at MIA. He testified that he is familiar with CBP's authority to conduct inspections of arriving international travelers, which includes the ability to inspect traveler's belongings, and electronic devices and has conducted inspections of electronic devices in the past.

On March 29, 2025, Officer Reyes reviewed the list of passengers arriving in the United States on a flight from Cuba, and saw an expired "lookout" for Defendant based on Defendant's criminal history in CBP's system. The "lookout" indicated that Defendant was previously investigated for downloading and distributing child pornography in 2010, and that the investigation

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

was also closed that same year. Officer Reyes placed another "lookout" on Defendant to flag him for secondary inspection when he arrived in MIA from Cuba. Upon arrival, Defendant was referred to the secondary inspection area at MIA. Officer Reyes met Defendant there and escorted him into an interview room. Officer Reyes confirmed Defendant was not handcuffed and, while Officer Reyes was carrying his service weapon, it was not displayed. Officer Reyes further affirmed that he did not threaten Defendant, raise his voice at Defendant, or accuse him of any crime.

Officer Reyes asked Defendant general questions about his travel itinerary, whether he was married, and where he lives and works. Defendant disclosed that he worked as a scuba instructor and was in Cuba on a diving trip with students. At this point, Officer Reyes asked Defendant whether he had any electronic devices with him. Defendant provided a cell phone and iPad tablet which he placed on the table. According to Officer Reyes, when he asked Defendant for the passcode to the devices, Defendant responded that he did not "feel comfortable" giving the passcode because he had a "previous conviction." Officer Reyes then gave Defendant a CBP document entitled "Border Search of Electronic Devices," referred to as a "Tear Sheet." *See* [ECF No. 79 at 3–4]. Officer Reyes explained to Defendant CBP's authority to conduct border searches on electronic devices.

The Tear Sheet, a two-page document, explains CBP border search procedures for the search of traveler's electronic devices. *See* [ECF No. 67-1]. The sheet states in relevant part as follows:

> You are receiving this document because CBP intends to conduct a border search of your electronic device(s). This may include copying and retaining data contained in the device(s). The CBP office conducting the examination will speak with you and explain the process.

> Travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for the examination of the device and its contents. Failure to assist CBP in accessing the electronic device and its contents

3

for examination may result in the detention of the device in order to complete the inspection.

Throughout the CBP's inspection, you should expect to be treated in a courteous, dignified, and professional manner. As border searches are a law enforcement activity, CBP officers may not be able to answer all of your questions about an examination that is underway. If you have concerns, you can always ask to speak with a CBP supervisor.

[*Id.*].

After providing the Tear Sheet to Defendant and giving him the opportunity to review it, Officer Reyes again explained CBP's border search authority, specifically informing Defendant that if he did not supply the passcodes, his devices would be detained. According to Officer Reyes, Defendant again stated that he did not "feel comfortable" providing the passcode and he asked to see a supervisor. Officer Reyes then called for his supervisor, Officer Burgos.

Officer Burgos came to the interview room, explained the information on the Tear Sheet to Defendant, then left.  Officer Reyes then asked Defendant again for the passcodes and Defendant provided them. Officer Reyes testified that Defendant provided the passcodes verbally and was not threatened (orally or physically) to provide the code. He further testified that if Defendant had not provided the passcode, Officer Reyes would have detained the devices. He denied that Defendant was told that he had no choice but to provide the passcode.

After Defendant provided the passcode, Officer Reyes escorted Defendant back to the general waiting room and then returned to the interview room alone where he began a basic electronic device search. He unlocked Defendant's phone using the passcode and put the phone on airplane mode. During the search Officer Reyes found a hidden folder in Defendant's phone's photo library, and in the hidden folder found videos of suspected CSAM. After finding the videos, Officer Reyes contacted his supervisor to brief him on the situation and contacted HSI and Agent Silva. Agent Silva reviewed the videos and confirmed they depicted CSAM.

Defendant was then brought back into the interview room. Agent Silva informed Defendant of his *Miranda* rights and began speaking with him. Officer Reyes was present in the room for this interview. After being given a verbal *Miranda* advisement, Defendant signed a written *Miranda* advisement and waiver form. *See* [ECF No. 79 at 5]. The waiver of rights form contains Defendant's signature, the date and time at which he was taken into custody and signed the form, as well as the signatures of both Officer Reyes and Agent Silva. *See* [ECF No. 79 at 5] Agent Silva then began questioning Defendant during a recorded interview, the beginning of which was played in open court. *See* [ECF No. 79 at 6].

On cross-examination, Officer Reyes confirmed he made notes during his interaction with Defendant and prepared an incident report, a TECS Electronic Media Report, and TECS Secondary Inspection Report. Officer Reyes confirmed that his initial conversation with Defendant, before the *Miranda* warning was given by Agent Silva, was not recorded, despite the availability of cameras in the interview room. Officer Reyes confirmed that the "lookout" was for an investigation that was opened and closed in 2010. He explained the TECS Secondary Inspection Report indicated that Defendant was initially referred to secondary inspection due to his declaration of alcohol from Cuba. He admitted that Defendant's passport was taken before he was brought to the secondary inspection area. Officer Reyes testified that Defendant was not free to leave once he was referred to secondary inspection. Officer Reyes confirmed that Defendant would not have been allowed to leave the secondary inspection area until he spoke to him.

Officer Reyes confirmed that after asking for Defendant's passcode the first time, Defendant replied that he did not feel comfortable providing it. At this point, Officer Reyes did not seize the devices and again confirmed that Defendant would not have been free to leave at that time. During cross-examination, defense counsel reviewed the language on the Tear Sheet with

5

Officer Reyes: "Travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for the examination of the device and its contents." *See* [ECF No. 79 at 3].

Officer Reyes confirmed that this language meant that Defendant was obligated to produce his device under the authority conferred by the CBP. Officer Reyes stated that Defendant had the option to provide the passcodes and could have chosen not to do so. However, he admitted that language allowing Defendant the option not to provide passcodes is not explicitly stated on the Tear Sheet.

Defense counsel then confirmed the timeline of Officer Reyes' actions. Officer Reyes' interview with Defendant began at approximately 4:35 p.m. and he began his review of Defendant's phone at approximately 5:25 p.m. The total time between the beginning of the interview and when the passcodes were provided was almost one hour.

Officer Reyes confirmed that Defendant went through secondary CBP inspection at a port of entry and was detained pursuant to CBP's border inspection authority. Officer Reyes confirmed that Defendant was not handcuffed at any point, was not under arrest during his interview with Officer Reyes, was not told that he was under arrest, and was not physically restrained. Officer Reyes testified that Defendant did not request to leave at any point, and that the Tear Sheet explains that the failure to assist CBP in accessing an electronic device can result in detention of the device. Officer Reyes stated that had Defendant left his devices and they were detained, he would have been free to leave. Finally, at no point during either Officer Reyes' or Officer Burgos' interview did Defendant ask to leave.

<u>Officer Daniel Burgos Direct Examination</u>

Officer Burgos testified that he was called to assist in Defendant's interview because Defendant had requested a supervisor. Officer Burgos testified that Defendant asked why he was in secondary inspection, and that Officer Burgos explained CBP's border inspection authority. He testified that he did not threaten Defendant, did not see anyone else threaten Defendant, did not raise his voice to Defendant, did not make any promises to Defendant, did not tell Defendant that he would be arrested if Defendant did not provide his device passcodes, did not tell Defendant that CBP could physically force Defendant to disclose his passcode, and did not see anyone physically compel Defendant to provide his passcode. He stated that Defendant looked confused, but not fearful or intimidated. After explaining CBP's border search authority to Defendant several times, Officer Burgos left the room and had no other participation in the case.

<u>Audio Recording of Interview with Agent Silva</u>

The audio recording of Agent Silva's interview with Defendant was admitted into evidence at the hearing and reviewed by the Court *in camera*. [ECF No. 79 at 6].

In the recording, Agent Silva identified himself and explained that he is with Homeland Security Investigations and would be interviewing Defendant. Officer Reyes was present in the room. Agent Silva explained that he works closely with CBP and is sometimes called in when certain situations arise during secondary inspections. Agent Silva asked general background questions, including Defendant's address and employment. Defendant told Agent Silva that he was a former attorney practicing both criminal and civil litigation. Notably, Defendant told Agent Silva that he was previously a state prosecutor for a total of four years and worked at three different district attorney's offices in New York, before working in criminal defense. Defendant explained he was disbarred due to a previous criminal conviction.

Agent Silva stated that he would like to discuss "some of the stuff that was" observed on Defendant's phone, and began to read Defendant a *Miranda* advisement. But before Agent Silva could complete the advisement, Defendant began to recite the *Miranda* advisement from memory. Agent Silva stopped Defendant, advised that he would read each right individually and ask Defendant if he understood each right. He explained that he would give Defendant a written copy and the opportunity to read the written advisement before signing. Defendant acknowledged that he understood each individual right after they were read to him, understood the waiver, and signed the document.

After signing the waiver, Agent Silva asked Defendant why he was initially hesitant to provide his phone passcode. Defendant responded that it was due to personal information on his phone. Agent Silva asked if there was anything other than personal information on his phone that he would be concerned about law enforcement seeing. Defendant responded "probably" and that there may be searches and information on the phone that could be "problematic." Defendant then stated that he would be willing to have a conversation that goes in a "particular direction" but was not looking to incriminate himself. Defendant did not ask to end the interview or speak with an attorney at this point. Defendant then, without verbal prompting or being asked, gave his passcode to Agent Silva.

Agent Silva then asked general questions about Defendant's devices, such as how long he has had them and who has access to the devices. He then asked Defendant whether he had ever been offered child pornography for purchase through the devices. Defendant replied he had been offered through an app called Signal. Defendant stated that he did not purchase child pornography from the app. Defendant stated that there may have been group chats where videos and links were being sent. Defendant was then shown a conversation thread from an app called Telegram, where

8

he was being offered child pornography to purchase. In the conversation thread, Defendant replied asking questions about delivery of the material and the videos. Defendant acknowledged that he had asked questions about the videos being offered but did not purchase them. Defendant then admitted that it was possible that there were CSAM on his devices.

Agent Silva then told Defendant that CSAM material was found in Defendant's photo library within a hidden folder and discussed details of what was found. The parties then discussed how the materials ended up on Defendant's phone and why Defendant is interested in the type of material. During this conversation, Defendant stated that he was "burying himself" and should have "shut his mouth" earlier, but then stated that he is not "invoking it[,]" purportedly in reference to his Fifth Amendment right against self-incrimination. Toward the end of the interview, while attempting to open a password-requiring app on Defendant's device, Defendant again verbally provided the passcode to his phone, which he believed to be the same passcode as the app.

## LEGAL STANDARD

The evidentiary burden at a suppression hearing is preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974). Whether a statement is voluntarily given must be examined under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Supreme Court has held that a defendant's statement to authorities is voluntary if it is "the product of a rational intellect and a free will." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). "Among the factors [the Court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) (citing *Bustamonte*, 412 U.S. at 226; *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996)); *see*

9

*also Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 347 (1963) ("a confession . . . must be free

and voluntary . . .  not obtained by any direct or indirect promises, however slight." (cleaned up,

internal quotes omitted) (citing *Bram v. United States*, 168 U.S. 532, 542–43 (1987)).[2]

### **DISCUSSION**

### A.  **Defendant Voluntarily Provided His Cellphone Passcode**

After reviewing the totality of the circumstances, the Court finds that Defendant's

statements in which he provided his passcode were voluntary. The factors the Court uses to assess

whether a defendant's statements to authorities were made based on rational intellect and free will

include (1) intelligence, (2) the length of his detention, (3) the nature of the interrogation, (4) the

use of any physical force against him, and (5) the use of any promises or inducements by police.

*See Hubbard*, 317 F.3d at 828; *Mincey*, 437 U.S. at 398.

As to the first factor of intelligence, an individual with Defendant's legal experience clearly

knows he has a right to silence. The record reflects that Defendant previously practiced as an

attorney in both civil and criminal litigation. In fact, he was a prosecutor for four years *and* a

criminal defense attorney. *See* [ECF No. 67 at 9]. His contention that he simply assented to a show

---

[2] Defendant does not argue that the statement given to Officer Reyes ran afoul *Miranda v. Arizona* or that a *Miranda* warning was needed during Officer Reyes' secondary inspection interview. 384 U.S. 436 (1996). Indeed, the Eleventh Circuit and courts in this District have held that defendants are not in "custody" within the meaning of *Miranda* during routine secondary inspections at the border. *See United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (no *Miranda* warning needed at border secondary inspection interview where defendant not physically moved or restrained, no handcuffs used, officers did not draw guns, defendant not booked or put under arrest); *See United States v. Munoz-Gutierrez*, 259 F. App'x 197, 200 (11th Cir. 2007) (finding that referral of a person entering the United States to a secondary inspection is part of the routine border interrogation  and  does not, in and  of  itself,  require  a *Miranda* warning) (citing *Moya*, 74 F.3d at 1120); *United States v. Vallerius*, No. 17-CR-20648, 2018 WL 2325729, at *4 (S.D. Fla. May 1, 2018), *report and recommendation adopted*, No. 17-20648-CR, 2018 WL 2324059 (S.D. Fla. May 22, 2018) (no *Miranda* warning needed at secondary inspection where defendant not restrained or moved, not in handcuffs, no guns were drawn, and defendant did not ask to leave).

of what he thought was lawful authority because he had never practiced federal law nor had legal experience with the authority of Customs and Border Protection is less than credible. *See* [ECF No. 72 at 6–7]. Indeed, during his recorded interview with Agent Silva, Defendant recited his *Miranda* rights from memory and stated that he would not be invoking his Fifth Amendment right. *See United States v. Juan*, No. 206-CR-123-FTM-29DNF, 2007 WL 2238215, at *9 (M.D. Fla. Aug. 1, 2007) (finding statement to police to be voluntary where "[t]here was no evidence that the Defendant has other than average intelligence, and there w[as] no evidence that her lack of a formal education hindered her abilities to understand the situation."); *Edwards v. Mcneil*, No. 3:09-CV-575-J-20JRK, 2011 WL 98407, at *3 (M.D. Fla. Jan. 12, 2011) (considering factors that petitioner was "an adult, had a GED and a full-time job . . . was clear of mind and free of substances that would interfere with his decision" to give voluntary statement to police); *see also United States v. Mock*, No. 2:12CR104-MHT, 2013 WL 1984370, at *4 (M.D. Ala. May 13, 2013) (denying motion to suppress where defendant attorney stated he "probably should [have] plead[ed] . . . the Fifth Amendment" but still continued to testify).[3]

Moreover, in line with considerations of the nature of the interrogation, whether there was use of any physical threats, and the use of inducements or promises by the police, "[t]o establish his confession was involuntary, [a defendant] must also establish police coercion." *Moya*, 74 F.3d at 1120; *see also Singleton v. Thigpen*, 847 F.2d 668, 671 (11th Cir. 1988) ("Coercive police

---

[3] Indeed, courts have held statements to be voluntary in more drastic situations concerning the intelligence and mental state of a defendant. *See United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary."); *United States v. Davis*, No. 10-20896-CR, 2012 WL 41929, at *5 (S.D. Fla. Jan. 9, 2012) (finding defendant with verbal learning disability made voluntary statement despite police impersonating defendant's mother to coerce inculpatory evidence); *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (defendant suffering from chronic schizophrenia and who was in psychotic state the day before confession did not by itself render a waiver involuntary).

activity is a necessary predicate to a finding that the confession by a person with a low intelligence level is involuntary." (citation omitted)). There was no evidence that Defendant was threatened in any physical or verbal manner, nor restrained in any way, and Officer Reyes made no promises to Defendant to induce his statement. *See also United States v. Davis*, No. 10-20896-CR, 2011 WL 6965662, at \*6 (S.D. Fla. Sept. 30, 2011), *report and recommendation adopted*, No. 10-20896-CR, 2012 WL 41929 (S.D. Fla. Jan. 9, 2012) (statements voluntarily given where "detectives did not draw their weapons . . . [nor] make any threats or physically harm the defendant."); *Cobb v. Sec'y of Dep't of Corr.*, No. 8:10-CV-1796-T-30TBM, 2011 WL 5525355, at \*6, \*10-11 (M.D. Fla. Nov. 14, 2011) (finding the defendant "freely and voluntarily" made statements to officers when "[n]o promises were made to [him], he was not threatened or coerced[,] was never told that he was not free to leave," and was not "handcuffed, shackled, or physically restrained in any way during questioning . . . ." ); *United States v. Barnes*, 596 F. App'x 821, 823–24 (11th Cir. 2015) (statements voluntarily given where defendant "was not physically or verbally coerced[,] and . . .[was] not promise[d] [] any reward for cooperating.").

Defendant argues that his statement was coerced based on a misrepresentation of controlling law. He claims that not only did Officer Reyes convey during the initial interview that Defendant was required to provide his passcode, but the Tear Sheet also unlawfully required him to do so. *See* [ECF No. 63 at 7–8]; [ECF No. 72 at 2–8]. Namely, Defendant takes issue with language in the Tear Sheet stating: "Travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for the examination of the device and its contents[,]" and Officer Reyes' explanation of the same. *See* [ECF No. 79 at 3]. Defendant argues that such explanation is wrong as a matter of law, and that the language in the Tear Sheet

creates a coercive implication that travelers have no other choice but to provide passcodes to their devices during secondary inspections. *See* [ECF No. 63 at 7–8]; [ECF No. 72 at 2–8].

However, Defendant should have known he had the option to leave his devices without providing a passcode. *See United States v. Asher*, No. 1:09-CR-414-WSD-AJB, 2010 WL 4237579, at *6 (N.D. Ga. Oct. 21, 2010) (finding totality of circumstances indicated defendant was free to leave interview). Indeed, the very next sentence of the Tear Sheet he was given states "[f]ailure to assist CBP in accessing the electronic device and its contents for examination may result in the detention of the device in order to complete inspection." *See* [ECF No. 79 at 3]. The remaining paragraphs of the Tear Sheet apprises travelers that should they not provide a passcode or assist CBP officers in accessing their device, the device may be detained to complete the inspection, and they would be free to retrieve the device after (should the device not be seized under the law). *See* [*id.*]. Thus, the information shows travelers that they are free to leave if the subject device is left in the custody of CBP. The record here shows that Defendant was given the opportunity to read the Tear Sheet multiple times in full. While Officer Reyes testified that Defendant was not free to leave until he had spoken to him, this does not mean that Defendant could not have refused to provide the passcode and left his devices in custody as indicated in the Tear Sheet.

Indeed, the Tear Sheet has entire section titled "Return or Seizure of Detained Electronic Device(s)" which provides that a detained electronic device will be returned, or "if it is impractical for you to pick up your device, CBP can make arrangements to return your device to you." *See* [ECF No. 79 at 3]. Certainly, this Defendant, a former criminal lawyer, could have asked Officer Burgos whether he was free to leave if he had any doubts about Officer Reyes' statements or the

Tear Sheet. There is no evidence that Defendant asked to leave or attempted to leave, with or without his electronic devices.

Defendant also argues he was questioned by three officers during the inspection, thus creating a coercive environment. *See* [ECF No. 72 at 9–10]. But he requested to speak with Officer Burgos, Officer Reyes' supervisor, after reading the Tear Sheet. Then, he eventually spoke with Agent Silva only after child pornography was found on his cellphone and after receiving a *Miranda* warning. The total time that elapsed from when he encountered Officer Reyes in secondary inspection until he provided his passcode was approximately one hour. During that time, aside from questions regarding the passcodes and his brief conversation with Officer Burgos, Office Reyes asked Defendant general questions about his travel and his electronic devices, gave Defendant the Tear Sheet and the opportunity to read it. This does not create a coercive environment in and of itself. *See Shriner v. Wainwright*, 715 F.2d 1452, 1455–56 (11th Cir. 1983) (intense questioning for five hours in a small room while handcuffed was not coercive); *United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002) (questioning in the presence of seven armed officers was not in itself coercive); *United States v. Woodson*, 30 F.4th 1295, 1306–07 (11th Cir. 2022) (no set timeline "after which an interrogation is necessarily custodial" and questioning going as long as four hours have been found to be non-custodial (citing *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001))[4]; *Mcneil*, 2011 WL 98407, at *3 (finding statement to be voluntary where interview only lasted one hour, was conducted in an interview room approximately eight by ten feet with two officers present and where there was "nothing

---

[4] "Voluntariness of statements is analyzed similarly to voluntariness of a waiver of a waiver of rights under" *Miranda*. *See United States v. Kell*, No. 1:16-CR-121-ELR-AJB, 2017 WL 3929319, at *2 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, No. 01:16-CR-121-ELR-AJB, 2017 WL 3944290 (N.D. Ga. Sept. 6, 2017) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Connelly*, 479 U.S. 156, 168 (1986)).

inherently terrifying or foreign in the interview room . . . to create a threatening atmosphere . . . .").

Again, Defendant, an experienced criminal lawyer, did not ask to leave, to stop the questioning, or for an attorney at any point during the hour in secondary inspection. Instead, he gave Officer Reyes the passcode to his cellphone. *See Cajan v. Crews*, No. 13-CV-22573, 2014 WL 12929717, at *8 (S.D. Fla. May 16, 2014), *report and recommendation adopted*, No. 13-22573-CIV, 2014 WL 12929716 (S.D. Fla. June 3, 2014) (defendant who "was not arrested or placed in handcuffs . . . never asked to stop the interview or leave . . . was not arrested until interview was completed . . . under the circumstances would not have believed they were not free to leave."); *Mcneil*, 2011 WL 98407, at *3 (no coercion or involuntary statements given during interview where petitioner "never asked for questioning to stop, he never asked for an attorney, and never said he did not want to talk anymore.").

Moreover, the Government more likely than not would have still accessed Defendant's phone, even if he refused to provide the passcode. Indeed, the Government stated that had Defendant ultimately refused to provide the passcode, his devices would have been detained and sent to HSI for data extraction to complete the inspection. This contention is also clearly stated on the Tear Sheet and under CBP's border search authority. *See* [ECF No. 79 at 3 ("Failure to assist CBP in accessing the electronic device and its contents for examination may result in the detention of the device in order to complete the inspection.")]. Therefore, the evidence on the phone would have been inevitably discovered with or without Defendant's statement and passcode. *See United States v. Todd*, No. CR 416-305, 2017 WL 1197849, at *13 (S.D. Ga. Feb. 10, 2017), *report and recommendation adopted,* No. CR 416-305, 2017 WL 1172113 (S.D. Ga. Mar. 29, 2017)

(declining to suppress phone evidence discovered from non-mirandized custodial disclosure of password where government possessed technology to access phone without password).

After a review of the totality of the circumstances the Court concludes that Defendant's provision of his passcode to Officer Reyes was voluntary.

### B.  The Search of Defendant's Devices Did Not Violate The Fourth Amendment

Finally, Defendant argues that the search of his devices violated his Fourth Amendment rights because the Government did not have probable cause and a warrant to seize and search the devices, nor reasonable articulable suspicion. *See* [ECF No. 63 at 4–6]. Defendant acknowledges that contrary binding Eleventh Circuit law exists as to this issue; namely, that the Eleventh Circuit has "held that the search of electronic devices at the border is routine, and therefore an individual has no Fourth Amendment protection in his electronic devices at the border." *See* [*id.* at 6 (citing *Touset*, 890 F.3d at 1227)]. Defendant nevertheless preserves this issue, noting that it is on appeal in the Second Circuit, and may result in a circuit split. *See* [*id.*].[5]

In any event, the binding law in the Eleventh Circuit is that under the border search exception to the Fourth Amendment, no suspicion is needed for CBP to search electronic devices at a border. *See Touset*, 890 F.3d at 1232 ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property.").

---

[5] The Ninth and Fourth Circuits have come to opposite conclusions as the Eleventh Circuit. *Compare Touset*, 890 F.3d at 1234 (finding that "searches at the border are reasonable without suspicion") *with* United States v. Cotterman, 709 F.3d 952, 957 (9th Cir. 2013) ("Mindful of the heavy burden on law enforcement to protect our borders . . . we conclude that . . . reasonable suspicion was required for the forensic examination of Cotterman's laptop.") *and  United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018) (requiring at least reasonable suspicion for forensic examination of device at border).

Defendant relies on *Riley v. California*, 573 U.S. 373, 393 (2014), for the proposition that probable cause and a warrant are required.  In *Riley*, the Supreme Court held that the search-incident-to-arrest exception does not support the search of a cellphone found on the arrested individual. *See* 573 U.S. at 393.  In this district, that case has not yet been applied to searches of electronic devices at the border. In fact, the Eleventh Circuit Court of Appeals has determined that "[n]othing in *Riley* undermines" the interest of the Government "in preventing the entry of unwanted persons and effects [which is at its] zenith at the international border." *See Touset*, 890 F.3d at 1235 (internal quotes omitted) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004)). The Court is bound by the decisions from the Eleventh Circuit.

Under present Fourth Amendment law in this Circuit, because Defendant was encountered by CBP at the border with his cellphone, his cellphone could be searched without a warrant, and even without his voluntary provision of the passcode. The Motion to Suppress must be denied.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 63] be **DENIED**.

Objections to this Report may be filed with the district judge within **TEN** (10) days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 2nd day of July, 2026.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:     **United States District Judge Ed Artau;**
        **All counsel of record.**