UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-CR-20160-ARTAU

UNITED STATES OF AMERICA,

Plaintiff,

v.

DANIEL HALLORAN,

Defendant.
_________________________________/

**OBJECTIONS TO REPORT AND RECOMMEDATION**

Daniel Halloran, through counsel, respectfully submits his objections to the Report and Recommendation (R&R). (DE 81). Mr. Halloran argues that—contrary to the R&R—this Court should find that the government did not prove by a preponderance of the evidence that Mr. Halloran voluntarily provided his cell phone passcode to Officer Reyes. This Court must also reject the R&R's baseless conclusion about inevitable discovery. This Court must review the R&R, Mr. Halloran's objections, the transcript, the record, and the applicable law *de novo*. § 28 U.S.C. 636(b). That review is critical here. The R&R—perhaps because the transcript was unavailable when the R&R issued—is not an accurate or reliable recitation of the evidence or the applicable law and therefore reaches the wrong conclusion.

## I. There is no evidence in the record that supports inevitable discovery

The R&R's conclusion regarding inevitable discovery reveals unequivocally that the R&R is ***not*** a reliable or accurate recitation of the evidence. The government

did not argue inevitable discovery in its briefing. Nor did the government present any evidence or testimony to support the inevitable discovery doctrine at the hearing. Moreover, at the hearing, the magistrate judge recognized that a finding of inevitable discovery was impossible. After the close of evidence and during the government's rebuttal argument, the magistrate judge told the government: "Without the passcode, you've not made a claim that the government would have been able to get into the phones, the electronics." (Tr. 139:15—17). The government responded, "we can – we can – if Your Honor wants, we can call a witness and – to that effect and establish that." (Tr. 139:18—20). The magistrate judge then correctly found, "But that [inevitable discovery] has not been established at this point." (Tr. 139:21-23). Yet, contrary to the absence of evidence and the magistrate judge's own finding at the hearing, the R&R states that "the evidence on the phone would have been inevitably discovered with or without the Defendant's statement and passcode." (DE 81 at 15). This about-face is troubling.

Under the inevitable discovery doctrine, the government must show that law enforcement was actively pursuing lawful means to discover the evidence prior to the illegal conduct. *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007). And the government must prove by a preponderance of the evidence that law enforcement would have discovered the evidence absent the illegal conduct. *Id*. Here, the government was required to present evidence that before Officer Reyes told Mr. Halloran that he was obligated to provide his passcode, law enforcement was pursuing the means to access the contents of the phone without the passcode. In

addition, the government must prove by a preponderance of the evidence that law enforcement could have extracted the data from the phone—the images and videos that constitute the offense—without the passcode. No such evidence exists in the record. The magistrate judge easily recognized this at the hearing but reached the opposite conclusion in the R&R. Thus, the R&R made a legal finding that government did not argue or produce evidence to support; this violates the separation of powers doctrine and the principle of party presentation. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578-79 (2020) (explaining that courts decide only the issues presented by the parties). The R&R's baseless finding regarding inevitable discovery is reason alone for this Court to reject the R&R.

**II. Mr. Halloran did not voluntarily provide his passcode to Officer Reyes**

The R&R (1) fails to grapple with material facts that are central to the totality of the circumstances analysis; (2) fundamentally misunderstands Mr. Halloran's argument; (3) applies an incorrect legal standard to determine voluntariness that improperly shifts the burden to Mr. Halloran; and (4) relies on cases that are irrelevant to the totality of the circumstances and legal issues in Mr. Halloran's case.

These errors are not peripheral. They go to the heart of whether the government carried its burden. It did not. The record, considered in its entirety and under the correct legal standard, permits only one conclusion: Mr. Halloran's disclosure was not the product of a free and voluntary choice. This Court's *de novo* review provides the necessary safeguard against allowing the government's constitutional violation to stand.

A. The R&R fails to consider material facts under the required totality of the circumstances analysis

The R&R fails to meaningfully consider significant facts that are integral to a totality of the circumstances analysis. Specifically, the magistrate judge failed to meaningfully consider that (1) Mr. Halloran did not have his passport; he was not free to leave the airport or the interview room; and he was required to speak to Officer Reyes, (2) Mr. Halloran refused to provide his passcode ***four times***; law enforcement ignored his refusals and told Mr. Halloran that he was obligated to provide the passcode, and (3) it took one hour and three federal officers before Mr. Halloran finally provided his passcode.

***i. Once Mr. Halloran surrendered his passport, he was not free to leave, and he was required to speak to Officer Reyes***

At primary inspection, Mr. Halloran surrendered his passport to Customs and Border Protection (CBP). His passport was never returned. From that point forward, Mr. Halloran was not free to leave. (Tr. 53:20–22). A law enforcement officer escorted Mr. Halloran to secondary inspection. (Tr. 54:1–17). Officer Reyes testified that Mr. Halloran was "obligated" to follow the officer. (Tr. 54:1–17). In other words, Mr. Halloran did not have a choice but to obey the officer; he was required to proceed to secondary inspection without his passport. (Tr. 53:20–22, 54:1–14). When Mr. Halloran arrived at secondary inspection, Officer Reyes was waiting for him. (Tr. 55:2-5). Officer Reyes told Mr. Halloran, "Follow me sir; follow me sir," and entered a small interview room. (Tr. 59:6-8). In the interview room, the door was closed. (Tr. 58:25—59:1).

Mr. Halloran was ***required*** to speak to Officer Reyes. Officer Reyes testified that Mr. Halloran could ***say***, "I don't want to speak you at all," but Mr. Halloran "has to do the interview with me." (Tr. 59:17-23). When asked what would happen if Mr. Halloran had remained silent, Officer Reyes responded, "I have to wait until he decide[s] to talk;" "[h]e's not free to leave." (Tr. 60:4-6). Officer Reyes confirmed that Mr. Halloran was obligated, under the authority of the United States Customs and Border Protection, to remain inside the interview room. (Tr. 60:7-9, 61:14-16).

These circumstances matter. Before Officer Reyes asked for Mr. Halloran's passcode, Mr. Halloran was stripped of his passport, obligated to proceed to secondary inspection, told to enter a small interview room, and obligated to speak to Officer Reyes. (Tr. 53:20–22, 54:1–17, 58:25–59:8). Mr. Halloran could not terminate the interview. Indeed, if he had remained silent, he would have remained inside the interview room with Officer Reyes, unable to leave. (Tr. 59:17–23).

The R&R acknowledges that Mr. Halloran did not have his passport, and that he "was not free to leave once he was referred to secondary inspection." (DE 81 at 5). But the R&R fails to recognize the import of these facts in the required totality of the circumstances analysis. Specifically, the R&R's later conclusion that Mr. Halloran "should have known"—an incorrect legal standard for voluntariness, which will be discussed later—that that he could refuse to provide his passcode and leave the interview room is irreconcilable with the evidence and the magistrate judge's findings that Mr. Halloran was ***not*** free to leave the interview room, and he was ***required*** to speak to Officer Reyes. (DE 81 at 13; Tr. 53:20–22, 59:17–23, 60:2–6, 61:14–16).

### *ii. Mr. Halloran refused to provide his passcode four times, but law enforcement ignored him and told him that he was obligated to provide the passcode*

Inside the interview room, Officer Reyes asked Mr. Halloran questions about his background and travel itinerary. Mr. Halloran was required to answer. (Tr. 59:17-23). Officer Reyes told Mr. Halloran to place his cell phone and tablet on the table. Mr. Halloran was required to do so. (Tr. 64:2—13). Against this backdrop, Officer Reyes asked Mr. Halloran to provide the passcode for his devices. (Tr. 13:20–23, 64:24–65:3).

***<u>Mr. Halloran's first refusal</u>***

Mr. Halloran refused. (Tr. 13:24–14:1, 64:24–65:3). His refusal was neither equivocal nor implied. Officer Reyes testified that Mr. Halloran responded, "'I don't want to provide [the passcode for] the devices,' because he had a previous conviction, and for that reason he don't feel comfortable to provide the passcode for the devices." (Tr. 13:24 – 14:1). Mr. Halloran did not provide the passcode. (Tr. 64:24–65:3). What followed is indispensable to any faithful assessment of voluntariness. As discussed, the R&R claims that Mr. Halloran "should have known" that he could have refused to provide his passcode. (DE 81 at 13). But Mr. Halloran ***did*** refuse to provide his passcode, and Officer Reyes testified to exactly what happened when he did. (Tr. 64:24–65:21)

After Mr. Halloran's first refusal, Officer Reyes did ***not*** tell Mr. Halloran that CBP would retain his devices and that he was free to leave. (Tr. 65:4–12). On the contrary: even after Mr. Halloran expressly refused to provide his passcode, he

remained "***not free to leave***." (Tr. 65:13–15) (emphasis added). More pointedly still, Officer Reyes testified that, had Mr. Halloran left his devices behind and attempted to walk out, Officer Reyes would have stopped him because Mr. Halloran remained obligated to stay with him inside the interview room. (Tr. 65:16–21).

Instead of honoring, or even acknowledging, Mr. Halloran's refusal to provide his passcode, Officer Reyes told Mr. Halloran about the authority of United States Customs and Border Protection and provided Mr. Halloran with the Tear Sheet. (Tr. 66:4-9). Officer Reyes testified that the Tear Sheet is "the law." (Tr. 68:5-6). "That is the law and the authority that we have." (Tr. 68:5). It states—in writing—Mr. Halloran's obligations under the law of the United States Customs and Border Protection. (Tr. 71:14—19). As Officer Reyes provided the Tear Sheet to Mr. Halloran, he "explained my work, that the Tear Sheet is the border search [authority] that we have as CBP – as Customs and Border Protection officer. And after I finished that, I gave him ample time to read the front and back space." (Tr. 16:6-9).

Thus, after Mr. Halloran refused to provide his passcode, Officer Reyes invoked the authority of the United States Government and gave Mr. Halloran an official statement of "the law," which declared that travelers were "obligated" to make both their devices and the information contained within them accessible for examination. (Tr. 68:5-6, Gov. Ex. 1). These circumstances are not collateral to the voluntariness inquiry; they ***define*** it. Mr. Halloran had unequivocally refused, remained unable to leave, and was then confronted with the government's assertion of legal authority over precisely what he had refused to do.

***<u>Mr. Halloran's second refusal</u>***

After reading the Tear Sheet, Mr. Halloran again refused to provide his passcode. (Tr. 74:6—8). This was his second refusal. Officer Reyes did ***not*** tell Mr. Halloran that his devices would be seized, and that he was free to catch his flight. (Tr. 74:9–17). On the contrary, Mr. Halloran was ***still*** "not free to leave" and "obligated to stay." (Tr. 74:10—75:2). If Mr. Halloran had left his devices on the table and attempted to walk out, Officer Reyes would have stopped him. (Tr. 75:3—9). Officer Reyes ignored Mr. Halloran's second refusal. He again informed Mr. Halloran of his obligations under the authority of Customs and Border Protection. (Tr. 75:10–25). In other words, Officer Reyes showed Mr. Halloran that his refusal meant nothing. Officer Reyes refused to take "no" for answer—twice.

***<u>Mr. Halloran's third refusal</u>***

Mr. Halloran still did not provide the passcode—his third refusal. (Tr. 75:11-24). After his third refusal, Officer Reyes testified that Mr. Halloran was still not free to leave. (Tr. 75:25—76:1). So, Mr. Halloran asked to speak to a supervisor. (Tr. 76:2-3). While Mr. Halloran waited, he remained "not free to leave." (77:14–16). Supervisor Burgos arrived and repeated the information contained in the Tear Sheet—that travelers are obligated to provide their devices to allow for inspection of the device's contents. (Tr. 77:17–78:9). Supervisor Burgos left the interview room. (Tr. 78:19-20).

***<u>Mr. Halloran's fourth refusal</u>***

Mr. Halloran again refused to provide his passcode—his fourth refusal. (Tr. 78:22—79:1):

> So after Officer Burgos tells Mr. Halloran the same information that is on this tear sheet, he leaves?
>
> A. Yes, ma'am.
>
> Q. Mr. Halloran still had not -- is refusing to give his pass code, correct?
>
> A. Yeah. He don't want to give the pass code.

Again, Mr. Halloran's fourth refusal was not acknowledged or honored. It was ignored. Mr. Halloran was still not free to leave the interview room. (Tr: 79:5—8):

> After Mr. Halloran again says that he doesn't want to give his pass code with Supervisor Burgos, same thing, Mr. Halloran's not free to leave, right?
>
> A. No, he's not free to leave.

A third officer, Officer Fracisco Mendoza, entered the room. (Tr. 79:3–13). According to Officer Reyes, Officer Mendoza repeated the information on the Tear Sheet and Mr. Halloran's obligation under the law. (Tr. 79:15-23). It was at this point that Mr. Halloran finally provided the passcode[1]. (Tr. 79:14–80:14).

***iii. It took almost one hour and three officers before Mr. Halloran submitted to their authority and provided his passcode***

[1] At this point, Officer Reyes had asked Mr. Halloran for his passcode and told him he was obligated to provide it at least twice. (Tr. 66:4—9, 75:10—25). Supervisor Burgos had told Mr. Halloran he was obligated to provide his passcode at least three times. (Tr. 96:10—12). And Officer Mendoza had told Mr. Halloran that he was obligated to provide his passcode at least once. (Tr. 79:15—23).

It took nearly one hour, four refusals, and three federal officers reiterating the government's asserted authority and Mr. Halloran's obligations under the law to obtain a four-digit passcode. (Tr. 80:15–81:5). The R&R gets this critical chronology wrong and therefore misses the significance of the facts. *First*, the R&R only recites two of Mr. Halloran's refusals—his initial refusal to Officer Reyes and his refusal after he read the Tear Sheet. (DE 81 at 3-4). But the transcript reveals that Mr. Halloran refused ***four separate times***. (Tr. 64:21—65:3, 74:6-9, 75:11-24, 78:22-25). The R&R's failure to accurately recite the facts—Mr. Halloran's four refusals and the officers' persistence—contributes to the R&R's incorrect conclusion regarding voluntariness.

*Second*, the R&R states that after Supervisor Burgos left, "Officer Reyes then asked Defendant again for the passcodes and Defendant provided them." (DE 81 at 4). But that is ***not*** what happened. After Supervisor Burgos left, Mr. Halloran again refused to provide his passcode. (Tr. 78:22—25). Officer Mendoza—who is not mentioned in the R&R—entered the room and repeated Mr. Halloran's legal obligations, and Mr. Halloran finally surrendered his passcode. (Tr. 79:15—79:1). Notably, the government, who bears the burden to prove voluntariness, chose not to call Officer Mendoza to testify[2].

*Third*, the R&R acknowledges Mr. Halloran's argument that it took one hour and three officers to obtain the passcode but dismisses that argument for two reasons

[2] Related to the government's burden: Officer Reyes testified that there was a camera in the interview room designed to record audio and video; yet he made no effort to obtain a recording, even though he knew—that same day—that Mr. Halloran would be prosecuted. (Tr. 41:7—21, 85:1—87:9).

that are demonstrably incorrect. First, the R&R erroneously states that the "three officers" were Officer Reyes, Supervisor Burgos, and HSI Agent Silva. (DE 81 at 14). The R&R then undercuts Mr. Halloran's argument by explaining that Agent Silva interrogated Mr. Halloran ***after*** he surrendered his passcode. (DE 81 at 14). But Mr. Halloran's argument on this point has nothing to do with Agent Silva. The three officers were Reyes, Burgos, and Mendoza. This is another example of how the R&R fails to correctly and accurately recite the evidence and therefore misunderstands the argument. Second, the R&R summarily concludes that one hour of questioning is not coercive. (DE 81 at 14). But again, this is not Mr. Halloran's argument. Mr. Halloran is not arguing that one hour inside the interview room is coercive per se. Rather, his argument is that it required one hour, four refusals, and three officers repeating the same legal authority—while Mr. Halloran was without his passport, not free to leave, and missing his connecting flight—to force Mr. Halloran to answer ***one*** question. In other words, the R&R cannot dismiss the one-hour duration as evidence ***against*** coercion while overlooking what filled that hour: four refusals, continued detention, and three federal officers reiterating governmental authority—before Mr. Halloran finally submitted to that authority.

The R&R's failure to consider the facts and circumstances that bear most directly on voluntariness does not merely undervalue the record. It erroneously and unfairly ignores the government's own evidence of continued detention, Mr. Halloran's refusals, and his eventual assent to continuous assertions of lawful

authority. If the R&R had meaningfully considered these undisputed facts, there would have been no question that the government failed to meet its burden.

B. The R&R fundamentally misunderstands Mr. Halloran's argument

Mr. Halloran's argument is simple and easily supported by the facts and the applicable law. First, the facts: the Tear Sheet and the federal officers misstated the law by informing Mr. Halloran that he was ***obligated*** to provide his passcode. Second, the legal significance: when the government misstates the law and claims authority that it lacks, this is coercion. And Mr. Halloran's submission to the government's claim of lawful authority cannot be voluntary.

***i. The Tear Sheet—and the officers who repeated the information on the Tear Sheet—misstates the law***

The Tear Sheet states that travelers are ***obligated*** to present electronic devices and the information resident on those devices in a condition that allows for inspection, *i.e.* obligated to provide the passcode. (Gov. Ex. 1). According to the government—as testified to by Officer Reyes—the Tear Sheet is ***the law***. (Tr. 67:25—68:7). But travelers are ***not*** obligated to provide their devices in a condition that allows for inspection of the device's contents, *i.e.* ***not*** obligated to provide a passcode.[3]

Those propositions cannot be reconciled. If Mr. Halloran has a lawful choice whether to disclose his passcode, the government cannot not accurately tell him, verbally and through a United States Customs and Border Protection document

[3] Another troubling contradiction: the Tear Sheet states that CBP "strictly adheres to all constitutional and statutory requirements." (Gov. Ex. 1). But according to government, a traveler has no constitutional protection in his electronic devices. So, again, the Tear Sheet is providing travelers with false information regarding constitutional rights.

presented as "the law," that he is "obligated" to provide his passcode. (Tr. 18:24–19:3, 68:5–6). In other words, if disclosing a passcode is optional, the government informed Mr. Halloran of an obligation that does not exist. If disclosing a passcode is required—as stated on the Tear Sheet and repeated by the officers—then Mr. Halloran did not provide his passcode voluntarily; he simply complied with his legal obligation. Put yet another way, the government cannot inform Mr. Halloran that he is legally obligated to provide his passcode and then argue that Mr. Halloran provided his passcode voluntarily. The government cannot have it both ways.

Officer Reyes' testimony highlights the problem. He readily verified that every statement on the Tear Sheet was a true and accurate statement of the law. He quickly confirmed that "travelers are obligated to present electronic devices and the information resident on the device in a condition that allows for examination of the device and its contents." (Tr. 69:18—70:1). He agreed that this obligation is pursuant to the authority of the United States Customs and Border Protection. (Tr. 70:2—5). He testified that "information resident on the device" means the content on the device—for example, apps, photographs, emails, and anything else on a cell phone. (Tr.71:24—72:5). But when confronted again with the fact that the Tear Sheet informs travelers that they are obligated to present their device in a condition that allows for law enforcement to inspect the ***contents*** of the device, Officer Reyes reversed his previous testimony and claimed that the Tear Sheet ***only*** states that a traveler is obligated to present his devices. (Tr. 72:22—23). Of course, this is

demonstrably false. But Officer Reyes' attempt to hide from the legal obligations on the Tear Sheet reveals the problem with misstating the law.

#### ***ii. The government claimed authority that it lacked; this is coercion, and it renders Mr. Halloran's statement involuntary***

A suspect's statement is involuntary when law enforcement's "deception goes directly to the nature of the suspect's rights and the consequences of waiving them." *United States v. Morgan*, 143 F.4th 1264, 1277 (11th Cir. 2025). For example, a confession was found to be involuntary when an officer read the suspect *Miranda* warnings and then later told the suspect that "honesty wouldn't hurt him." 143 F.4th 1264, 1277-78. This is because "honesty won't hurt you" contradicts the *Miranda* warning that "anything you say can be used against you." *Id.* A confession must be thrown out "if the government feeds the defendant false information that seriously distorts his choice [to confess]." *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).

This is precisely the case for Mr. Halloran. In fact, the government's deception in Mr. Halloran's case is more egregious than that described in *Morgan*. This is because—more than informing Mr. Halloran of his legal rights and then making a statement that undermines those rights—the Customs and Border Protection officers—verbally and through the Tear Sheet—told Mr. Halloran that he was obligated, under law, to provide his passcode. This is false. Mr. Halloran has a Fifth Amendment right ***not*** to provide his passcode. In other words, the government fed Mr. Halloran false information—that he was obligated to provide his passcode—which "seriously distorted his choice" of whether to provide his passcode. The

government's "affirmative misrepresentation of the law" means that Mr. Halloran's statement—his passcode—was not voluntary. *Morgan*, 143 F.4th 1264, 1278.

Indeed, "deception invalidates consent when police claim authority they lack." *United States v. Spivey*, 851 F.3d. 1207, 1214 (11th Cir. 2017). Consent cannot be "a function of acquiescence to a claim of lawful authority." *Id.* (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). When law enforcement claims authority that it lacks, "the situation is instinct with coercion—albeit colorably lawful coercion." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). Here, Mr. Halloran did not provide his passcode voluntarily because he did so in response to a claim of authority. *See Bumper*, 391 U.S. 543, 548-50; *United States v. Tobin*, 923 F.2d 1506 (11th Cir. 1991) (explaining if the circumstances indicate the defendant opened the door in response to a "show of official authority," then the defendant did not do so voluntarily) (citing *United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986)).

The R&R does not mention any of these cases—cited in the briefing and at the hearing—that clearly apply and support Mr. Halloran's argument. Thus, the R&R fails to acknowledge the misstatement of law and the legal significance of the misstatement of law. Instead, the R&R admits that the Tear Sheet—and the officers who repeated it—told Mr. Halloran that he was obligated to provide his passcode but claims that Mr. Halloran "should have known" he did not have to provide his passcode. (DE 81 at 13). This conclusion is not supported by evidence or the law and turns the standard for voluntariness on its head.

C. <u>The R&R applies an incorrect standard for voluntariness that shifts the burden to Mr. Halloran</u>

The magistrate judge never addresses the legal significance of the contradiction between the Tear Sheet, which tells Mr. Halloran that he is legally obligated to provide the passcode, and Mr. Halloran's Fifth Amendment right ***not*** to provide his passcode. Instead, the R&R rationalizes that because the next sentence on the Tear Sheet states "that failure to assist CBP in accessing the electronic device and its contents for examination may result in detention of the device to complete the inspection," Mr. Halloran "should have known he had the option to leave his devices without providing a passcode." (DE 81 at 13). But what Mr. Halloran "should have known" is not the question for the court. This is ***not*** the standard to prove voluntariness. Under the law, the government must prove by a preponderance of the evidence that Mr. Halloran voluntarily provided his passcode. Specifically, the burden is on the government to establish voluntary choice rather than acquiescence to asserted legal authority. *See Bumper*, 391 U.S. at 548–50; *Blake,* 888 F.2d at 798; *Spivey,* 861 F.3d at 1214.

The R&R thus commits a grave error by reversing the constitutional inquiry. The question is not whether Mr. Halloran, a detained traveler who had already refused to provide his passcode (four times), should somehow have discerned that the government's statement of his legal obligation meant less than it said. The question is whether the government proved that Mr. Halloran's eventual disclosure was the product of free choice rather than acquiescence to legal authority. *See Bumper*, 391 U.S. 543, 548-50. On this record, it did not. The government cannot tell an individual

that the law requires compliance and then prove voluntariness by insisting that an individual should have known he was free to disobey.

Setting aside the incorrect standard for voluntariness, there are at least three inescapable problems with the R&R's claim that Mr. Halloran "should have known he could leave his devices without providing a passcode." *First*, after reading the Tear Sheet, Mr. Halloran ***did*** refuse to provide his passcode—***three more times***. But his refusals were never honored or even acknowledged; they were ignored. And Officer Reyes testified that after each of Mr. Halloran's refusals, he was ***not*** free to leave, even if he left his devices. (Tr. 65:13—21, 74:10—75:2, 77:14–16, 79:5—8).

The R&R concedes that Officer Reyes "testified that [Mr. Halloran] was not free to leave until he had spoken to him" but claims that "this does not mean that Mr. Halloran could not have refused to provide the passcode and left his devices in custody as indicated on Tear Sheet." (DE 81 at 13). This is nonsensical. Mr. Halloran ***did*** refuse to provide his passcode, and Officer Reyes testified he was not free to leave—without or without his devices—after his refusal. (Tr: 79:5—8). Officer Reyes admitted this supposed "option to refuse" is nowhere on the Tear Sheet. (Tr. 73:13-17). On the contrary, each time Mr. Halloran refused to provide his passcode, Officer Reyes (or Officer Burgos or Officer Mendoza) ***told*** Mr. Halloran that he was obligated to provide it. Specifically, Officer Reyes testified that he, Supervisor Burgos, and Officer Mendoza repeated Mr. Halloran's ***legal obligations*** on the Tear Sheet. (Tr. 73:17—74:5; 77:17–78:9; 79:15-23).

*Second*, the sentences on the Tear Sheet on which the R&R relies state only that the device may be detained, and that CBP will notify a traveler if he can retrieve the device. Yet the R&R extrapolates an entirely different proposition about what the ***traveler*** may do: "[t]hus, the information [on the Tear Sheet] shows travelers that they are free to leave if the subject device is left in the custody of CBP." (DE 81 at 13) (emphasis added). It does not. This is conjecture. The Tear Sheet does not inform—or show—a traveler that he is free to leave, under any circumstance. It merely tells a traveler what may happen to the device if he fails to comply with his legal obligations.

*Third*, the Tear Sheet first tells travelers what they are "obligated" to do—provide the passcode—and then identifies what "may" happen if they fail to do so. (Gov. Ex. 1). In other words, the statement that CBP may detain the device merely informs travelers of ***one possible consequence*** of failure to follow the purported law. Yet the duty to follow the law—provide the passcode—remains. Identifying a possible consequence of noncompliance does not transform an obligation into an option. A simple analogue illustrates the point. If an officer tells a motorist she is obligated to turn left and then warns that failure to do so may result in a citation, no reasonable motorist would understand that turning left is optional. The fact that there are consequences for breaking the law or disobeying a law enforcement officer does not mean that the law or the law enforcement officer's directions are optional. This is precisely the case here. Mr. Halloran was informed—via the Tear Sheet and the officers—that he was obligated to provide his passcode. The Tear Sheet also informed him of a possible consequence of failure to follow his legal obligation. But the legal

obligation remained. And the officers reinforced this by repeating the obligation several times until Mr. Halloran eventually complied.

Thus, the R&R places an improper and illegal burden on Mr. Halloran: it requires him to discern an option from the Tear Sheet that is not clearly stated and that was explicitly contradicted by the Tear Sheet itself and the officers several times. But if providing a passcode is truly optional, Mr. Halloran did all that was necessary: he refused. Not just once, but four separate times. There is no burden on Mr. Halloran to do more. He was not required to leave his devices and attempt to walk out of the room. No traveler in Mr. Halloran's position—detained and without his passport—would feel that he could simply stand up and leave the interview room, with or without his devices.

D. The R&R relies on cases that are irrelevant to the totality of the circumstances and the legal issues in Mr. Halloran's case

The cases cited in R&R are not applicable to the facts or legal analysis in Mr. Halloran's case. The R&R concludes that Mr. Halloran provided the passcode voluntarily because (1) he is intelligent and has legal training, so he "should have known" he could refuse to give his passcode; (2) he was not beaten, physically restrained, threated, or promised anything; and (3) one hour in custody is not coercive. But these findings are irrelevant to the facts and the government's burden to prove voluntariness in Mr. Halloran's case.

***i. Intelligence and legal training***

The R&R concludes that because Mr. Halloran is intelligent and has previous legal experience, he "clearly knows he has the right to silence," and his argument that

he assented to a claim of lawful authority because he had not practiced federal law or had legal experience with CBP is "less than credible." (DE 81 at 10). First, this is not Mr. Halloran's argument. Mr. Halloran never claimed diminished intelligence. Nor did he argue that he assented to law enforcement's claim of authority ***because*** he was not trained in federal law or on the authority of CBP. Rather, Mr. Halloran eventually provided his passcode because law enforcement—verbally and through the Tear Sheet—told him he was ***obligated*** to do so. Regardless of his previous legal training, Mr. Halloran was not required to challenge the authority of the officers. Moreover, Mr. Halloran attempted to invoke his right to silence—he refused to provide his passcode four times. His refusals were not honored by law enforcement. Every time he refused to provide his passcode, the officers continued to require it. As Officer Reyes testified, if Mr. Halloran had remained silent: "I have to wait until he decide[s] to talk;" "[h]e's not free to leave." (Tr. 60:4-6).

The R&R cites *United States v. Juan*, No. 2:06-cr-123-FTM-29DNF, 2007 WL 2238215 (M.D. Fla. Aug. 1, 2007); *Edwards v. McNeil*, No. 3:09-CV-575-J-20JRK, 2011 WL 98407 (M.D. Fla. Jan. 12, 2011); and *United States v. Mock*, No. 2:12CR104-MHT, 2013 WL 198370 (M.D. Ala. May 13, 2011). But these cases are not instructive or relevant to Mr. Halloran's case. In each case, the district found that a statement voluntary based, in part, on the defendant's average intelligence, mental state, or the fact that his attorney had informed him of his right to remain silent. (DE 81 at 11). But none of the cases involved an assertion of authority by law enforcement and an acquiescence to that authority by the defendant.

The R&R persists in placing a burden on Mr. Halloran simply because of his previous legal training: Mr. Halloran, "an experienced criminal lawyer did not ask to leave, to stop the questioning, or for an attorney[.]" (DE 81 at 15). But Mr. Halloran refused to provide his passcode—four times. This is enough. Officer Reyes refused to take "no" for an answer. Mr. Halloran was not required to ask for an attorney or to ask to leave. Nor was he required to ask Officer Reyes to stop asking for his passcode. In other words, the government's burden to prove voluntariness does not disappear or lessen because the person confronting federal authority happens to be legally trained. Nothing required Mr. Halloran to test the limits of his detention or—in addition his four refusals—further challenge law enforcement's assertion that he was obligated to provide his passcode.

The R&R cites another unreported opinion, *Cajan v. Crews* No. 13-CV-22573, 2014 WL 12929716 (S.D. Fla. June 3, 2014). The court found Cajan was not in custody during his confession, and if he was, he voluntarily waived his rights. *Id*. at *8. Cajan voluntarily drove to the police station in response to a detective's phone call. *Id*. When he arrived, an officer read his *Miranda* rights; Cajan read the waiver and signed the form. *Id*. at *1. He spoke to the officer, and he never asked to stop the interview or to leave. *Id*. at *8. And the R&R cites *McNeil* again. Officers read McNeil his *Miranda* rights; McNeil waived his rights and agreed to speak. *McNeil*, WL 98407 at *3. During the interview, McNeil did not ask for attorney, to leave, or to stop the questioning. *Id*.

The circumstances in *Cajan* and *McNeil* are fundamentally different from Mr. Halloran's case. Neither *Cajan* nor *McNeil* involve an assertion of lawful authority. And, of course, no officer read Mr. Halloran *Miranda* warnings. Unlike Cajan, Mr. Halloran did not agree to meet with a police officer. He was stopped at the airport, stripped of his passport, told to enter an interview room, and told he was obligated to provide his passcode. When he refused—four times—he was not released. Instead, law enforcement told him he was obligated to provide his passcode, and Mr. Halloran submitted to that authority. Nothing of the sort occurred in *Cajan*, *McNeil*, or any case cited in the R&R.

***ii. Lack of threats, weapons, physical restraint, or promises***

When considering the nature of the interrogation, the R&R states only that Mr. Halloran was not "threatened in any physical or verbal manner, nor restrained in any way" and cites cases that found a statement voluntary, in part, based on the lack of drawn weapons, threats, physical harm, and promises. (DE 81 at 12). But this is not the type of coercion that occurred in Mr. Halloran's case.

The R&R acknowledges Mr. Halloran's argument that he was "coerced based on a misrepresentation of controlling law," and that Officer Reyes and the Tear Sheet told Mr. Halloran that he was obligated to provide his passcode. (DE 81 at 12—13). But, as discussed, the R&R dispenses with that argument because—despite being told that he was obligated to provide his passcode—Mr. Halloran "should have known he had the option to leave his devices without providing a passcode." (DE 81 at 13).

In support, the R&R cites only one case: *United States v. Asher*, No. 1:09-CR-414-WSD-AJB-1, 2010 WL 4237579 (N.D. GA Oct. 21, 2010). The court found that Asher was not in custody, so *Miranda* was not required. *Id*. at * 6. An officer interviewed Asher in his own home. *Id*. Asher was not restrained, and he was free to move around his residence. *Id*. The officer told Asher three times that he was not under arrest. *Id*. No weapons were drawn, and Asher knew he could terminate the interview. *Id*. Plainly, *Asher* is not relevant here. Asher never alleged that he submitted to show of lawful authority. Asher did not even claim that his statement was involuntary; he alleged only a *Miranda* violation. Unlike Asher, Mr. Halloran was not freely moving about his own home. He was inside an interview room at the airport; he had surrendered his passport to law enforcement. He was never told that he was not under arrest or that he was free to leave. On the contrary, Mr. Halloran was not free to leave, and he was required to speak to Officer Reyes.

***iii. Length of the interrogation***

Finally, the R&R considers the length of the interrogation and cites cases where a court found that longer periods of detention were not coercive. (DE 81 at 14). Again, none of these cases are relevant here. As discussed, Mr. Halloran's argument is not that one hour in custody is coercive per se. Rather, it took one hour, four refusals, and three officers asserting legal authority before Mr. Halloran finally assented to that authority and provided his passcode. This is coercion and accordingly, Mr. Halloran's statement—his passcode—was not voluntary.

**III. Mr. Halloran preserves his Fourth Amendment argument**

Mr. Halloran continues to preserve his argument that (1) he has Fourth Amendment protection in his electronic devices at the border, (2) law enforcement needed and did not have probable cause and a warrant to seize and search his devices, and (3) law enforcement lacked reasonable suspicion to seize and search his devices.

Officer Reyes testified that the reason Mr. Halloran was referred to secondary inspection was because, when researching passengers, he saw for Mr. Halloran that there was an inactive system record of an expired lookout related to an investigation that was closed in 2010 alleging potential involvement in downloading child pornography. (Tr. 42:5—46:18). But Officer Reyes conceded that, as stated in his report, Mr. Halloran was referred to secondary because he declared alcohol. (Tr. 49:5—22). This contradiction was never resolved by the government and raises questions as to the true genesis and good faith, or lack thereof, of Mr. Halloran's selection and detention. In any event, no evidence presented at the hearing amounted to reasonable suspicion or probable cause that—15 years after an "expired lookout"—Mr. Halloran was committing a specific crime or that evidence of a specific crime would be found on his cell phone. Mr. Halloran preserves all arguments from his briefing and the hearing (DE 63, 72, 76).

WHEREFORE, for the reasons set forth above and those stated at the hearing and in the briefing (DE 63, 72, 76), Daniel Halloran respectfully requests that the Court grant his objections to the R&R, find the government did not prove by a preponderance of the evidence that he voluntarily provided his passcode, and suppress the evidence obtained as a result of the passcode.

Respectfully submitted,

**HECTOR DOPICO**
**FEDERAL PUBLIC DEFENDER**
By: */s/ Ashley Kay*
Ashley Devon Kay
Assistant Federal Public Defender
Florida Bar No. 78991
150 West Flagler Street, Suite 1700
Miami, Florida 33130-1556
(305) 530-7000
ashley_kay@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on October 6, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/Ashley Kay*